IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| STEVEN TOWNSEND, | ) |
| Plaintiff, | ) |
| | ) NO. 3:24-cv-00003 |
| v. | ) JUDGE RICHARDSON |
| PINEWOOD SOCIAL, LLC, | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Pending before the Court is "Defendant's Motion to Compel Arbitration and Stay Judicial Proceedings" (Doc. No. 9, "Motion"). Defendant filed a memorandum in support of the Motion (Doc. No. 10, "Memorandum"). Plaintiff filed a response (Doc. No. 13, "Response") to which Defendant filed a reply (Doc. No. 14, "Reply"). For the reasons discussed herein, the Motion is granted in part and denied in part.

BACKGROUND[1]

Plaintiff Steven Townsend ("Plaintiff") worked as an Executive Chef for Defendant Pinewood Social, LLC ("Defendant"), a restaurant and cocktail bar, from July 2022 until he was terminated on January 16, 2023. (Doc. No. 8 at 2, 5). Roughly one year after his termination, Plaintiff initiated this action against Defendant by filing a Complaint alleging claims of

---

[1] The facts herein come from Plaintiff's First Amended Complaint (Doc. No. 8, "FAC"), Defendant's Memorandum (Doc. No. 10) and attachments thereto (Doc. Nos. 10-1, 10-2, and 10-3), Plaintiff's Response (Doc. No. 13) and attachments thereto (Doc. Nos. 13-1, 13-2), and Defendant's Reply (Doc. No. 14). The facts that are stated herein without qualification have not been disputed and are therefore accepted as true for purposes of deciding the instant Motion. *See* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."). Alleged facts that are qualified here in some way (as for example by being prefaced with "Plaintiff contends that") have been disputed and are treated as such.

employment discrimination, retaliation, and hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981("Section 1981"), and the Tennessee Human Rights Act ("THRA"). (Doc. No. 1). Plaintiff later filed the FAC (Doc. No. 8), which is the operative complaint in this case. The FAC likewise alleges claims of employment discrimination, retaliation, and hostile work environment.

Defendant asserts that when Plaintiff was hired, the parties executed an arbitration agreement ("Agreement"), whereby they mutually agreed to resolve through binding arbitration any claim(s) arising out of Plaintiff's employment with Defendant. (Doc. No. 10 at 1-2).

The Agreement states, in relevant part:

> Sometimes differences may come up between the Company and an employee, both during and after employment. The mutual goal is to resolve work-related problems, concerns and disputes in a prompt, fair and efficient way that protects the legal rights of You and the Company. To meet this goal, the Company uses the Dispute Resolution Process (DRP), which has three steps -- Open Door, Mediation, and Arbitration.
>
> The DRP, instead of court actions, is the only means for resolving employment-related disputes. Disputes eligible for DRP must be resolved only through DRP, with the final step being binding arbitration heard by an arbitrator. This means that DRP-eligible disputes will not be resolved by a judge or jury. Neither the Company nor You may bring DRP-eligible disputes to court. The Company and You waive all rights to bring a civil action for these disputes in any manner other than arbitration.

(Doc. No. 10-1 at 5, "Agreement"). According to Defendant, Plaintiff signed the Agreement (after having a chance to review it) when he was hired on July 6, 2022 via an online electronic portal. (Doc. No. 10 at 3). Additionally, Plaintiff electronically signed nine other documents through the online portal as part of his onboarding process.[2] (Doc. No. 10-1 at 4).

---

[2] The only document that Plaintiff contends he did not sign is the Agreement. (Doc. No. 13, 13-1).

On January 26, 2024, shortly after Plaintiff filed his initial Complaint, counsel for Defendant ("Mr. Shelton") sent counsel for Plaintiff ("Mr. Winfrey") an email to which a copy of the Agreement was attached. In his email, Mr. Shelton asked Mr. Winfrey to review the attached Agreement and notify Mr. Shelton as to whether Plaintiff would agree to "voluntarily dismiss the pending lawsuit and move into arbitration." (Doc. No. 10-3 at 8). Mr. Winfrey immediately called Plaintiff who "unequivocally denied signing the [Agreement] at any point in his . . . employment or onboarding process." (Doc. No. 13 at 3). Based on his conversation with Plaintiff, Mr. Winfrey responded to Mr. Shelton's email with an email to Mr. Shelton stating that the attachment to Mr. Shelton's email "did not include a signed agreement to arbitrate by [Plaintiff]" and that Plaintiff contended that "no such agreement was ever signed by him." (Doc. No. 10-3 at 26).

What followed was a lengthy and heated exchange of contentious emails between Mr. Shelton and Mr. Winfrey between January 26 and 27, 2024. (Doc. No. 10-1 at 14-26). After Mr. Winfrey pointed out that the document did not contain a signature,[3] Mr. Shelton sent Mr. Winfrey another email, this time attaching a version of the Agreement that included on the bottom of the last page what purported to be Plaintiff's electronic signature right next to a date of "07/06/2022." (Doc. No. 10-3 at 22-23). Mr. Winfrey responded to this email by contesting the validity of the electronic signature, stating "I'm just not buying that one . . . . That is not an electronic signature, rather just seems like a typed assertion." (*Id*. at 22). Mr. Winfrey also reiterated Plaintiff's position that Plaintiff did not sign an arbitration agreement and asserted that the properties of the Agreement attached to Mr. Shelton's email "indicate[d] clearly that the documents [Mr. Shelton] delivered

---

[3] As discussed below, Mr. Shelton contends that the document in the attachment to the first email he sent did include a signature when he attached it, but that after he attached it, the signature was "cleaned" or "scrubbed" by a software program on his computer as part of the transmission process. According to Mr. Shelton, this explains why the document *as it was received by Mr. Winfrey* did not show any signature.

were recently created and modified to reflect a purported signature of [Plaintiff]—which [Mr. Winfrey] contend[s] suggests a complete fraud." (*Id*.).

In a lengthy response to Mr. Winfrey, Mr. Shelton sought to explain the missing signature on the document attached to his first email. According to his explanation, a software product used by his law firm called "Metadact" "cleaned" the document attached to his first email of all information reflecting e-signatures. (Doc. No. 10-3 at 3-4). Once he learned that Metadact's "clean[ing]" function removed Plaintiff's e-signature from the document,[4] Mr. Shelton reattached the Agreement to a new email and selected the option to "skip" the cleaning, rather than "clean and send" as he had elected to do in his initial email. (Doc. No. 10-3 at 5). Regarding Mr. Winfrey's stated concerns over the properties of the attached document, Mr. Shelton explained that while he was trying to figure out why Mr. Winfrey had received an unsigned version of the Agreement, he sent the Agreement to his own email. (Doc. No. 10-3 at 5). As a result (according to Mr. Shelton), the properties of the executed document he sent to Mr. Winfrey show that it was "modified" on January 23, 2024 at 6:23 a.m.—the time at which he purportedly opened the Agreement to send it

---

[4] Mr. Winfrey responded to Mr. Shelton's first email by stating that Mr. Shelton's attachment "did not include a *signed* agreement to arbitrate." (Doc. No. 10-3 at 26) (emphasis added). Mr. Shelton's initial response to that email from Mr. Winfrey indicates that Mr. Shelton understood Mr. Winfrey to assert not that the attached document bore no signature at all, but rather only that the attached document was not signed in the traditional (i.e., non-electronic) manner. (*Id*. at 24). According to Mr. Shelton, he first discovered that the attached document in his initial email to Mr. Winfrey did not contain Plaintiff's signature *at all* on Saturday January 27, 2024 (the day after he sent the first email to Mr. Winfrey), when his client informed him that the document attached to the email to Mr. Winfrey was not showing the e-signature related information. (*Id*. at 4). Mr. Shelton also stated in his declaration his willingness to provide the Court "all relevant emails with [his] client for an in-camera inspection to verify the veracity" of this representation and other representations in his declaration. (*Id*.).

to himself. (*Id.*). In response, Mr. Winfrey insisted that Mr. Shelton's purported explanation was "an impossibility" and was "crafted" to "create plausible deniability."[5] (Doc. No. 10-3 at 16).

On February 19, 2024, Defendant filed the instant Motion requesting that the Court compel arbitration and stay judicial proceedings of the claims raised in the FAC pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq*. (Doc. No. 9). Defendant also seeks to recover reasonable attorney's fees and costs incurred in relation to the Motion. (*Id.*). Plaintiff opposes arbitration, insisting that he never received or signed any agreement to arbitrate. Plaintiff also asserts that Defendant's request for fees and costs is "baseless." (Doc. No. 13 at 13).

## LEGAL STANDARD

The Federal Arbitration Act provides that a written provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts."[6] *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (internal citation and quotation omitted).

Under the FAA, if a party establishes the existence of a valid agreement to arbitrate, the district court must grant the party's motion to compel arbitration and either stay or dismiss court proceedings until the completion of arbitration. *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2005) (citing 9 U.S.C. §§ 3-4); *see also Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (quoting 9 U.S.C. § 4; *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000))

---

[5] Mr. Winfrey also threatened to "expose all of [Mr. Shelton's] misrepresentations of the truth and seek severe sanctions" if Defendant pursued a motion to compel arbitration based on "this narrative." (Doc. No. 10-3 at 16).

[6] The Court recognizes that "equal footing" does not mean "preferential footing."

("'[W]hen asked by a party to compel arbitration under a contract, a federal court must determine whether the parties have agreed to arbitrate the dispute at issue.' If the district court is satisfied that the agreement to arbitrate is not 'in issue,' it must compel arbitration."). Importantly, to say that there is a *valid* agreement to arbitrate is to say two separate things: (i) that an agreement to arbitrate was concluded (i.e., that arbitration was agreed to at least to some extent and under certain conditions); and (ii) that the (actually existing) agreement is valid (i.e., legally binding rather than void for some reason). *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70 n.1 (2010) ("The [issue of the] *validity* of a written agreement to arbitrate [is] whether it is legally binding, as opposed to whether it was in fact agreed to"); *id.* at 71 n.2 ("The issue of the agreement's 'validity' is different from the issue whether any agreement between the parties 'was ever concluded[.]'"). !! "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-25 (1983).

Where a party seeks to compel arbitration, a court must begin its analysis by looking to the procedures set forth in the FAA. *See Proch v. King*, No. 2:22-CV-12141, 2023 WL 4940527, at *2 (E.D. Mich. May 5, 2023), report and recommendation accepted in relevant part, *Proch v. King*, No. 22-12141, 2023 WL 4936695, at *3 (E.D. Mich. Aug. 2, 2023) ("*Boykin* explained that the FAA itself, not the Rules of Civil Procedure, provide the starting point for determining how a party should invoke the FAA . . . . That is because the FAA supplants conflicting Federal Rules of Civil Procedure."). "Although the [FAA] requires a court to summarily compel arbitration upon a party's request, the court may do so only if the opposing side has not put the making of the arbitration contract 'in issue.'" *Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F.4th 832, 835 (6th Cir. 2021) (citing 9 U.S.C. § 4). To decide whether the existence of an agreement to arbitrate is actually "in issue," courts use the summary-judgment standard. *In re StockX Customer Data Sec. Breach*

*Litig.*, 19 F.4th 873, 881 (6th Cir. 2021); *Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F.4th 832, 838 (6th Cir. 2021) (noting that "Rule 56's standards govern whether a court should hold a trial under § 4 when a party alleges that no contract exists."). Consistent with Rule 56, the court views "all facts and inferences drawn therefrom in the light most favorable" to the party opposing arbitration and "determine[s] whether the evidence presented is such that a reasonable finder of fact could conclude that no valid agreement to arbitrate exists." *Great Earth Cos. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). "The party asserting the existence of a contract must first produce evidence, such as a signed agreement, that would support a reasonable jury's finding that a contract exists. The party contesting the existence of a contract must then present specific facts that would allow a reasonable jury to conclude that no contract was formed." *Structures USA, LLC v. CHM Industries, Inc.*, No. 3:21-cv-458-BJB-LLK, 2022 WL 882166, at *3 (W.D. Ky., Mar. 24, 2022) (citing *Boykin*, 3 F.4th at 839) (internal citation omitted). !

If the court finds that the making of the arbitration agreement is "in issue,"—i.e., that there is a genuine issue of material fact as to the whether the parties agreed to arbitrate—the court "shall proceed summarily to the trial on the disputed question." 9 U.S.C. § 4. Moreover, "a party who adequately puts the formation of an arbitration contract in issue may request discovery on that contract-formation question." *Boykin*, 3 F.4th at 841. However, if the opposing party fails to show that the making of the agreement is "in issue," the court must enforce the agreement as written and order the parties to arbitration. In other words, absent such a showing, the court must treat the agreement as having been made, and "the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

ANALYSIS

I.  **Plaintiff Has Not Put the Making of the Agreement "In Issue."**

The issue before the Court is whether Plaintiff has "adequately put in 'issue'" under the standards of Rule 56 whether he accepted the Agreement.[7] *Boykin*, 3 F.4th at 839. The Parties do not dispute that Tennessee law is applicable to determine whether they formed a contract, or that Tennessee law would permit Plaintiff to accept the Agreement by electronically signing it.[8] The Parties dispute only whether Plaintiff actually signed (or, for that matter, received) the Agreement.

Under Rule 56, Defendant has the initial burden to present evidence from which a reasonable jury could conclude that a contract exists.[9] *See In re StockX*, 9 F.4th at 881 (citing *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 417 (6th Cir. 2011)). Defendant has met this burden with ease. First, Defendant introduced a copy of the Agreement showing Plaintiff's electronic signature with an adjacent date of July 6, 2022. (Doc. No. 10-3 at 45). Second, Defendant offered a declaration from its Director of Operations stating that Plaintiff electronically signed the Agreement, just as Plaintiff signed the remaining onboarding documents. (Doc. No. 10-1 at 3). Additionally, Defendant offered a declaration from Charles Wood ("Wood"), Chief

---

[7] "Accepted" was the precise term used by *Boykin* in this context. *Boykin*, 3 F.4th at 839 ("This appeal thus turns only on whether Boykin accepted the contract *either* by electronically acknowledging it *or* by continuing to work for Family Dollar after learning of it."). The term here is somewhat imprecise and could be replaced by similar terms, such as "assented to." The concept appears to be that of manifesting an intent to be bound (mutually, along with Defendant) by the terms of the Agreement.

[8] Tennessee's Uniform Electronic Transactions Act states that "a record or signature may not be denied legal effect or enforceability solely because it is in electronic form." *See* Tenn. Code Ann. § 47-10-107(a).

[9] Plaintiff's sole basis for opposing the Motion is that he did not sign the Agreement. He does not argue alternatively that even if he did sign the Agreement (in whatever manner of signing), nevertheless no agreement was formed between the parties (due to, for example, *Defendant* not having signed or due to whatever circumstances may suggest the absence of valid contract formation despite both of the purported contracting parties having signed). Thus, Defendant need only offer evidence showing that Plaintiff signed the Agreement. Plaintiff has not disputed (at least for purposes of the instant Motion) the remaining elements required to form a valid, enforceable contract.

Operating Officer of Inova,[10] wherein Wood explained how Defendant has authenticated Plaintiff's purported electronic signature on the Agreement as having actually been placed on there (electronically, of course) by Plaintiff. (Doc. No. 10-2). In the paragraph immediately below, the Court summarizes Wood's explanation of this authentication process.

To each document requiring a signature as part of Plaintiff's onboarding process, a specific "ObjectID" is assigned by the Inova system. (*Id*. at 5). An "ObjectID" is likewise assigned to the "action" taken by a user who has created an account in the online system.[11] (*Id*.). When a system user has electronically signed a particular document, the system "links" the particular document with the "signature action" by showing "LINKED_ID" in the "Field" column of the audit report, thus indicating that a specific user signed that particular document.

Attached to Wood's declaration are two system audit reports ("reports") showing the history of electronic activity related to the ten documents Plaintiff allegedly signed as part of his onboarding process as a new employee of Defendant. (*See* Doc. No. 10-2 at 7-9, 11). According to Wood's sworn declaration, the reports show that Plaintiff accessed the portal on July 6, 2022 at 4:30 pm and changed his password from the random password that he was initially assigned by Defendant when Defendant first created his profile in the system. (Doc. No. 10-2 at 3-5 (citing Doc. No. 10-2 at 11)). The reports also show (at Row 14 of the second page) "LINKED_ID" in the "Field" column connecting the ObjectID assigned to the Agreement (2315401698) with the ObjectID assigned to a signature action by Plaintiff (187756162), thus indicating that user "STownsend 7836" signed the Agreement at 4:50 pm on July 6, 2022. (Doc. No. 10-2 at 8).

---

[10] Inova is a company that provides its clients (such as Defendant) with human resources-related systems, such as the online portal used by Defendant to facilitate its onboarding documentation process for new employees. (Doc. No. 10-1 at 2).

[11] The audit report reflects (and Plaintiff does not dispute) that Plaintiff created an account with the username "Stownsend7836."

Additionally, the reports show that the IP address from which Plaintiff initially accessed the portal to change his password matched the IP address of the user ("STownsend 7836") who signed the Agreement. This evidence—essentially an electronic "paper trail"—directly and overwhelmingly supports the conclusion that Plaintiff electronically signed the Agreement and is clearly sufficient for Defendant to carry its initial burden.

Because Defendant has met its initial burden, the burden shifts to Plaintiff to establish a genuine dispute over whether he signed the Agreement. *See* Fed. R. Civ. P. 56(a). To meet this burden, Plaintiff must present "specific facts, as opposed to general allegations," from which a reasonable trier of fact could find that he did not execute the Agreement. *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020). Plaintiff attempts to make this showing by pointing to (1) a declaration of his that unequivocally denies that he executed the Agreement or received notice of the arbitration policy, and (2) "circumstantial evidence" suggesting (according to Plaintiff) that counsel for Defendant made "deceptive" representations as to whether Plaintiff signed the Agreement. (Doc. No. 13 at 1). For the reasons stated below, Plaintiff's evidence is insufficient to create a genuine question of fact.

In his sworn declaration, Plaintiff states that he "unequivocally did not consent to, sign, acknowledge or authorize any type of arbitration agreement with [Defendant] on or about July 22, 2006." (Doc. No. 13-1 at 2). Plaintiff makes this outright denial based on: "(1) his memory and recollection of the employment related documents presented by [Defendant];" and "(2) his personal review of emails, onboarding materials, electronic employment records in his possession, and DocuSign records in 2022 – which did not include an arbitration agreement." (Doc. No. 13 at 10 (citing Doc. No. 13-1 at 2)).

Notably, Plaintiff does not directly dispute the accuracy of the facts set forth in Wood's declaration. Nor does Plaintiff assert that someone else (who may have had access) did or could have electronically signed the documents from the account assigned to him.[12] Rather, Plaintiff relies on *Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F.4th 832 (6th Cir. 2021) for the proposition that his declaration unequivocally denying that he signed the Agreement (or any agreement to arbitrate) is sufficient to create a genuine dispute of material fact as to whether he signed the Agreement. In *Boykin*, a defendant seeking to compel arbitration provided a declaration from its human resources manager stating that employees had to take an online arbitration training session during which they must review and accept the defendant's arbitration agreement.[13] 3 F.4th at 836. The defendant produced an electronic record showing that the plaintiff completed the arbitration training session. *Id*. Despite this electronic record, the plaintiff stated in an affidavit that she "unequivocally did not consent to, sign, acknowledge or authorize any type of arbitration agreement with [the defendant] . . . at any time." *Id*. at 840. The Sixth Circuit held that this "flat denial" created a factual dispute about whether the plaintiff accepted the arbitration agreement, and thus, whether the parties formed a contract. *Id*. at 840-41.

Plaintiff asserts that because "*Boykin* parallels the present situation in all relevant respects" the Court should reach the same conclusion here as the Sixth Circuit did in *Boykin*. (Doc. No. 13 at 9). However, several important facts distinguish this case from *Boykin*, causing the Court to conclude that a different outcome is warranted. First, the evidence put forth by Defendant is

---

[12] Even if Plaintiff had made such an assertion, he would still have to show that the individual who signed the documents from the account assigned to him did so without his permission and from the same IP address from which Plaintiff undisputedly signed the remaining onboarding documents.

[13] The online arbitration session at issue in *Boykin* stated in all capital letters that, by clicking "I ACCEPT," each employee acknowledges that the employee has read the agreement, that the employee and the company are giving up their trial rights, and that they are agreeing to arbitrate disputes instead. *Boykin*, 3 F.4th at 836.

considerably more specific and persuasive than that offered by the defendant in *Boykin*. In *Boykin*, the defendant offered only a "one-page document allegedly recording [the plaintiff's] completion of the arbitration session" in which the defendant claimed he participated. 3 F.4th at 842. Here, by contrast, Defendant has offered a detailed, step-by-step explanation of how the electronic record of Plaintiff's activity confirms that Plaintiff electronically signed the Agreement. Not only is Defendant's evidence more comprehensive and on-point than the evidence in *Boykin*, but the source of that evidence is also a third-party, Inova's Chief Operating Officer, Wood. In *Boykin*, by contrast, the defendant's own employee (a human resources manager) vouched for the accuracy of the record showing that the plaintiff completed the arbitration session. 3 F.4th at 839.

Additionally, in *Boykin*, the defendant's "one-page" electronic record showed (according to the defendant) simply that the plaintiff completed the online arbitration training session. Only by inference could one conclude that the plaintiff acknowledged and thereby accepted the arbitration agreement allegedly included in the session. Here, by contrast, Defendant has offered an electronic audit trail via the reports attached to Wood's declaration showing that Plaintiff signed the Agreement at a specific time on a specific date, from an IP address matching the IP address from which he created his initial account and electronically signed the remaining onboarding documents. This electronic audit trail is compelling evidence that Plaintiff in fact signed the Agreement. This is especially true in light of the fact that Plaintiff neither challenges the accuracy of the reports nor denies signing the other nine documents that Defendant contends he signed—documents that the reports show he signed on the same day he (according to the reports) signed the Agreement and from the same IP address from which he signed the Agreement as part of his onboarding process. This significantly undercuts Plaintiff's position as to the tenth document (the Agreement). *See Crews v. Maxim Healthcare Servs., Inc.*, No. 21-CV-01019-STA-JAY, 2021 WL

2417732, at *3 (W.D. Tenn. June 14, 2021) ("Further belying Plaintiff's assertion that his electronic signature on the arbitration agreement is invalid, is his conspicuous acceptance of the legal effect of his electronic signatures on every other piece of employment paperwork.").

Defendant's evidence also distinguishes this case from *Bazemore v. Papa John's U.S.A., Inc.*, 4 F.4th 795 (6th Cir. 2023), wherein the Sixth Circuit (relying on *Boykin*) held that the plaintiff's declaration stating that he never saw the arbitration agreement at issue created a genuine question of material fact. In *Bazemore*, the defendant pointed only to a record of the arbitration agreement with the plaintiff's name typed at the bottom alongside an electronic signature "userID" that the defendant's "Senior Director of People Services" stated was assigned to the plaintiff. *Id.* at 798. Here, by contrast, the reports (the accuracy of which is undisputed by Plaintiff) are considerably more detailed in tracing the signed Agreement to Plaintiff and are offered by a third party (rather than an employee of Defendant).

Had this case involved a handwritten signature, Plaintiff's outright denial may have been sufficient (particularly in light of *Boykin*) to create a genuine issue of material fact.[14] But Plaintiff's

---

[14] Under facts similar to those presented in this case, a North Carolina appellate court explained how an "electronic trail" enhances the ability to "remotely" (i.e., technologically) determine whether (and when) a contract has been viewed and signed:

> Were this a more traditional contract negotiation, in which the parties had mailed proposed contracts back and forth, a sworn affidavit stating that [the plaintiff] never reviewed or signed the contracts might be sufficient to create a genuine issue of material fact with respect to the knowledge element of ratification. But this case is different because [the defendant] presented evidence from the DocuSign records indicating that it sent the merchant services agreements to [the plaintiff] at the company email address. [The defendant] also submitted evidence from the DocuSign records that someone with access to that email viewed both the emails and the accompanying contracts, electronically signed them, and later viewed the completed contracts, which were sent to [the plaintiff] in a separate email.
>
> Simply put, the electronic trail created by DocuSign provides information that would not have been available before the digital age—the ability to remotely monitor when other parties to a contract actually view it.

unequivocal denial is blatantly contradicted by the undisputed electronic audit trail showing that Plaintiff signed the Agreement, such that no reasonable jury could believe Plaintiff's denial. True, Plaintiff's sworn denial counts as something, but under the circumstances it counts only as a "scintilla" of evidence—and under the applicable summary judgment standard, a mere scintilla is not enough to allow the non-movant to prevail. *See Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 565 (6th Cir. 2016) ("[A] 'mere scintilla' of evidence will not be enough for Plaintiffs to withstand summary judgment.").

Therefore, Plaintiff's denial is not sufficient to create a *genuine* issue of material fact. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020) ("[W]here self-serving testimony is blatantly and demonstrably false, it understandably may not create a genuine issue of material fact, thereby allowing a court to grant summary judgment.").[15]

Likewise unavailing is Plaintiff's purported "circumstantial evidence" that he never signed an arbitration agreement. Plaintiff argues that Mr. Shelton offered "suspicious-sounding excuses" and "conflicting documents" during the combative email exchange between counsel, thereby (according to Plaintiff) "rais[ing] legitimate red flags regarding the authenticity of the now-signed

---

*IO Moonwalkers, Inc. v. Banc of Am. Merch. Servs., LLC*, 814 S.E.2d 583, 586-87 (N.C. Ct. App. 2018).

[15] In citing *Davis*, the Court does not mean to suggest that Plaintiff's declaration was "blatantly" false in the sense of being outrageously or intentionally false—the Court leaves open the possibility that the falsity was merely misguided, the result of a faulty memory, etc. The Court's point in citing *Davis* is to note that where a plaintiff's self-serving testimony is contradicted by detailed evidence, the authenticity of which is entirely or at least mostly unchallenged, it is revealed to be very likely false and thus insufficient by itself to create a genuine issue of material fact.

arbitration agreement." (Doc. No. 13 at 11). Plaintiff has offered no evidence to substantiate what is at best mere speculation that Defendant (or Mr. Shelton) forged an electronic signature onto the Agreement in an effort to deceive both Plaintiff and the Court. Defendant, on the other hand, has offered a declaration from Mr. Shelton wherein Mr. Shelton explains that Plaintiff's signature was missing from the document attached to Mr. Shelton's first email to Mr. Winfrey because of a software product used by Mr. Shelton's law firm called "Metadact" that "cleaned" the document of all information reflecting e-signatures.[16] (Doc. No. 10-3 at 3-4). Mr. Shelton stated that once he learned that Metadact's "clean[ing]" function had removed Plaintiff's e-signature from the document, he reattached the Agreement to a new email and selected the option to "skip" the cleaning, rather than "clean and send" as he had elected to do in his initial email. (Doc. No. 10-3 at 5). Regarding Mr. Winfrey's contentions questioning the modified properties of the attached document, Mr. Shelton stated that while he was "trying to get to the bottom of why [Mr. Winfrey] had received a 'blank' version of the [A]greement," he sent the Agreement to his own email. (Doc. No. 10-3 at 5). As a result, (Mr. Shelton stated) the properties of the executed document he sent to Mr. Winfrey show that it was "modified" on January 23, 2024 at 6:23 am—the time at which he opened the Agreement to send it to himself. (*Id.*). The Court credits this testimony because in the Court's view, the explanation is internally consistent and also unexceptional for anyone who has electronically handled documents in contexts similar to that described by Mr. Shelton.[17]

---

[16] As discussed above, Mr. Shelton also included this explanation (in considerable detail) in his email response to Mr. Winfrey. (*See* Doc. No. 10-3 at 17-19).

[17] The Court also is justified in not assuming that Mr. Shelton in fact would be so motivated by the desire to get this one case to arbitration that he would pursue that desire in a manner that literally would jeopardize his entire legal career. Stranger things have happened, but the Court need not and does not assume that Mr. Shelton was willing to take such a risk.

Defendant also attached to its Memorandum a declaration from Darin Wall ("Wall"), a Network Administrator working in the IT Department of Mr. Shelton's law firm, Fisher Phillips. (Doc. No. 10-3 at 28-30). In his sworn declaration, Wall provided a detailed account (consistent with Mr. Shelton's stated explanation) of how Metadact "cleaned" the document attached to Mr. Shelton's first email, thereby removing Plaintiff's e-signature from the document. (*Id*. at 28-29). Wall also confirmed Mr. Shelton's assertion that opening a document from the firm's document management system would change the properties in the document to a "modified" date and time reflecting the last time the document was opened. (*Id*. at 30). Defendant's evidence thus supports Defendant's position that the lack of a signature in the attachment to Mr. Shelton's first email was nothing but an inadvertent mistake by Mr. Shelton for which he quickly accepted responsibility, quicky rectified, and went to great lengths to explain to Mr. Winfrey.

As noted above, Plaintiff offers no evidence (or specific argument) to counter Defendant's purported explanation for sending an attachment without Plaintiff's signature in his initial email. Rather, Plaintiff reiterates his position that Mr. Shelton's explanation "seemed far-fetched and lacked credibility because it appeared to [Mr. Winfrey] highly unlikely that a law firm email system would modify or 'scrub' the electronic signature off of an original pdf document." (Doc. No. 13 at 11). Plaintiff also asserts that his conclusion that Mr. Shelton's explanation lacked credibility finds support from the document properties confirming that the document attached to the second email (and showing Plaintiff's signature) showed that it was "modified" on January 27, 2024 at 6:23 am. (*Id*. at 11 (citing Doc. No. 13-4)). Plaintiff does not, however, challenge (or even address) the (innocent) explanation offered by Defendant (via Mr. Shelton and Wall's declarations) as to why the document properties show that the document was modified at that time.

Plaintiff simply has not pointed to evidence reasonably calling into question the authenticity of the proof that Plaintiff accepted the Agreement (or to be more precise, the authenticity of Plaintiff's electronic signature on the Agreement). Plaintiff has therefore failed to raise a genuine issue of material fact as to whether he signed the Agreement and cannot establish that the making of the agreement is "in issue." Accordingly, the Court must enforce the agreement as written and order the Parties to arbitration. *See* 9 U.S.C. § 4.

## II. Defendant Is Not Entitled To Attorney's Fees.

Defendant requests, pursuant to 28 U.S.C. § 1927, that the Court assess against Plaintiff Defendant's reasonable attorney's fees and costs incurred in bringing this Motion. Defendant requests that it be awarded its reasonable attorney's fees and costs for bringing this Motion based on (1) Plaintiff's refusal to voluntarily submit his claims to arbitration and (2) Mr. Winfrey's accusations against Defendant and Mr. Shelton of fraud. (Doc. No. 10 at 10).

Section 1927 provides that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. An attorney's conduct may be "sanctionable under § 1927 without a finding of bad faith, at least when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims." *Lee v. Horton*, No. 2:17-CV-2766-JPM-tmp, 2018 WL 6323081, at *5 (W.D. Tenn. Dec. 4, 2018) (quoting *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 396 (6th Cir. 2009) (internal citation and quotation marks omitted)). Section 1927 sanctions require a showing of something less than subjective bad faith, but something more than negligence or incompetence. *Id*. The decision to impose sanctions under 28 U.S.C. § 1927 is within the Court's discretion. *Id*.

The purpose of § 1927 is to deter dilatory litigation practices and punish aggressive tactics that far exceed zealous advocacy. *Kilgore v. Hunter*, No. 1:16-cv-340, 2018 WL 6613820, at *4 (E.D. Tenn. Nov. 27, 2018). Because Section 1927 prescribes an objective standard,[18] there must be some conduct on the part of the attorney that "falls short of the obligations owed by a member of the bar to the court and which . . . causes additional expense to the opposing party." *Id*. Simple inadvertence or negligence that frustrates the trial judge will not support a sanction under Section 1927. *ProCraft Cabinetry, Inc. v. Sweet Home Kitchen & Bath, Inc.*, No. 3:17-cv-01392, 2018 WL 928199, at *1 (M.D. Tenn. Feb. 16, 2018).

The Court would be remiss if it did not at least admonish Mr. Winfrey for his prematurely truculent tone as displayed in his email correspondence with Mr. Shelton. The Court acknowledges an attorney's ethical prerogative to be a zealous advocate for his client. But this obligation does not warrant the kind of combative tone or accusatory comments reflected in Mr. Winfrey's correspondence with counsel for Defendant, given the absence of substantial evidence to support the accusation at the time (and, as discussed above, even now). In short, a court should not begrudge an attorney being combative and accusatory towards opposing counsel under certain circumstances, but those circumstances did not exist here.

While Mr. Winfrey's behavior certainly reflects a lack of collegiality and civility, the Court does not find (particularly in light of *Boykin*) that Plaintiff's position with respect to whether he signed the Agreement is objectively unreasonable, so as to warrant sanctions under § 1927. The Court is confident in its conclusion that no reasonable jury could believe—in light of the overwhelming record evidence to the contrary—Plaintiff's assertion that he did not sign the

---

[18] Section 1927 imposes an objective standard of conduct on attorneys, and courts need not make a finding of subjective bad faith before assessing monetary sanctions under § 1927. *Seay v. Rowland*, No. 1:16-cv-00068, 2018 WL 6174692, at *10 (M.D. Tenn. Aug. 30, 2018).

Agreement. However, the Court is not willing to conclude that Plaintiff has committed perjury in making that assertion. Therefore, Plaintiff's counsel did not act unreasonably in questioning—based on the assertions made to him by his client—the authenticity of the documents he received from Mr. Shelton or in refusing to voluntarily submit to arbitration. And the Court would be loath to unduly disincentivize an attorney from asserting a factual position of his client that (as far as the Court can say right now) well may have been firmly held (even if erroneous) based on the client's personal recollection.

Accordingly, Defendant shall bear its own attorney's fees and costs incurred in bringing the Motion.

## CONCLUSION

For the aforementioned reasons, the Motion (Doc. No. 9) is GRANTED in part and DENIED in part. The Parties shall proceed to arbitration, and Plaintiff's claims are stayed pending arbitration. Defendant shall bear its own attorney's fees and costs related to the Motion.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE